## ATKINSON *v.* THOMAS.

### Opinion delivered March 3, 1919.

1. SPECIFIC PERFORMANCE—REAL PARTY IN INTEREST—EVIDENCE.—In a suit for specific performance of a contract by which defendant gave plaintiff an option to purchase land, evidence *held* to show that the contract was in fact made with plaintiff's husband, who was the real party in interest.

2. VENDOR AND PURCHASER—AUTHORITY TO RESCIND.—Where one enters into an option contract to purchase land, using his wife's name, it is not necessary for him to secure permission from her to rescind the contract, since she is not a party in interest to the contract.

3. HUSBAND AND WIFE—RESCISSION OF CONTRACT—EVIDENCE.—In a suit for specific performance of an option contract to purchase land for $4,000, evidence *held* to show that $200 was paid to plaintiff's husband, the real party in interest, for the purpose of rescinding the contract.

4. FRAUDS, STATUTE OF—RESCISSION OF CONTRACT.—A verbal rescission of an option contract to purchase land is available in equity to repel a claim upon that contract.

Appeal from Lincoln Chancery Court; *John M. Elliott,* Chancellor; reversed.

### STATEMENT OF FACTS.

On the 8th day of February, 1917, Mrs. Virgie Thomas brought this suit in equity against R. G. Atkinson for the specific performance of a certain real estate contract. The contract which is the basis of the suit is as follows:

"Yorktown, Ark., April 1, 1916.

"This agreement made and entered into this day and date by and between R. G. Atkinson, party of the first part, and Mrs. Virgie Thomas, party of the second part,

"Witnesseth, That whereas the first party has purchased from H. L. Hunter certain lands located at or very

near Yorktown, Lincoln County, Arkansas. Said lands fully described in deed from H. L. Hunter to R. G. Atkinson, dated March 31, 1916, and recorded in book 13, page 181, first party paying therefor the sum of four thousand, two hundred dollars cash, the said land having been leased by......................................................before this sale, they paying the annual rental of $500 per year. Now the said sum of $500 for rent is to be paid to first party for the years 1916 and 1917, the said parties continuing to hold under said lease until it expires.

"On or before December 1, 1917, the second party hereto is to have the option or privilege of purchasing said land for cash, and is to pay to the first party the sum of four thousand dollars cash. Upon the payment of said sum over and above the annual rent as stated above to first party or his assigns, then the first party is to make warranty deed to the second party, or her assigns, to the said lands, then this agreement is to become null and void.

"All improvements, if any are made during the life of this contract upon said lands, are to be free from any cost or charge to the first party hereto.

"Witness our hands and seals, day and date above written.

"R. G. Atkinson,
"Mrs. Virgie Thomas."

The plaintiff alleged in her complaint that on or about the second day of January, 1917, she tendered the defendant, Atkinson, $4,000 and demanded of him a deed conveying to her the lands described in her complaint and that the defendant refused to carry out the terms of his contract.

The material facts are as follows: R. L. Thomas, H. W. Thomas, T. A. Thomas and J. L. Thomas who are brothers, carried on a plantation supply business at Tarry and Yorktown, towns about five miles apart. The business became in an insolvent condition and a corporation composed of their principal creditors, called Lincoln Supply Company, was organized for the purpose of taking

over and carrying on the business at each place. The Thomas Brothers continued to manage the business. At the end of the year 1915, the business was not satisfactory to the creditors and R. G. Atkinson purchased all of the stock of the Lincoln Supply Company except two shares. He allowed the Thomas Brothers to continue to manage the business. T. A. Thomas and J. L. Thomas conducted the business at Yorktown and R. L. Thomas and H. W. Thomas conducted it at Tarry. In the fall of 1916 there arose dissension among the Thomas Brothers about the conduct of the business. R. G. Atkinson had known them all their lives and tried to adjust their differences. The agreement, when the Lincoln Supply Company was formed was that the Thomas Brothers should succeed to the assets as soon as the debts were paid. J. L. Thomas had some judgments against him and on that account conducted the business in the name of his wife, Virgie Thomas, and his deposits in the bank were carried in her name. J. L. Thomas had no interest in the business at Tarry. Atkinson first suggested to him that he buy out the Yorktown business. During this time J. L. Thomas and T. A. Thomas were conducting the business at Yorktown. About the beginning of the year 1917, J. L. Thomas sold his interest in the business to his brothers for the sum of $8,000. In closing up the trade a check was given him for $8,200, the $200 being given J. L. Thomas for an interest in a tract of land.

It is the contention of the defendant that this was given him for his interest in the land in controversy and that he and not his wife is the real party to the contract now sought to be specifically enforced.

On the other hand it is the contention of the plaintiff that this $200 was in payment of another tract of land and that she is the real party in interest to the contract involved in this suit.

T. A. Thomas first thought of buying the land involved in this suit. It was situated just back of their store at Yorktown and would be very useful to them in conducting their business there. It was the intention of

T. A. Thomas and J. L. Thomas at that time to purchase the interest of their brothers in the Yorktown business at the end of the year 1916. Atkinson agreed to furnish $4,000 of the amount necessary to purchase the land from Hunter and T. A. and J. L. Thomas were to furnish the additional $200, which was to be paid immediately. Thus far the facts are practically undisputed.

According to the testimony of J. L. Thomas, when it came time to close the trade with Hunter for the land in controversy, his brother, T. A. Thomas, told him that he could not furnish any part of the $200 and would relinquish his rights to be a party to the contract. His wife, Virgie Thomas, then concluded to become a party to the contract and she furnished the $200 out of her own money. J. L. Thomas sold his interest in the business to his brothers for $8,000, the money being furnished by R. G. Atkinson. Subsequently an additional $200 was included for his interest in a tract of land but which was not the tract of land in controversy. J. L. Thomas admitted that during all this time he had conducted his business in the name of his wife, but denied that her signature to the contract in question was placed there as a cloak for him and that he was the real party in interest in the contract for the sale of the lands involved in this suit.

Mrs. Virgie Thomas, also, testified that she was the real party in interest in the contract and signed her name as such. She denied that her husband had any interest whatever in the contract. She said that she made the $200 from her cows and chickens and keeping a few boarders. She denied that she gave her husband the right to sell her interest in the contract at the time he sold out his interest in the business.

On the other hand according to the testimony of R. G. Atkinson, Mrs. Virgie Thomas was not a party to the contract but her husband signed her name thereto in pursuance of his usual custom; that he conducted his business in his wife's name and that she knew nothing about the business and had no interest whatever therein. When J. L. Thomas sold out his interest in the business he was

paid $200 additional to cancel his interest in the contract involved in this suit. R. L. and T. A. Thomas both corroborated the testimony of Atkinson in every respect. In addition T. A. Thomas said that he first thought of buying the land from Hunter because it was near their store and would be useful to them in conducting the business of selling plantation supplies; that their business furnished the $200 which was paid by J. L. Thomas at the time the contract was entered into; that he thought J. L. Thomas had taken the contract for them until some time after its execution when he asked his brother to see it; that J. L. Thomas first put him off and finally showed him the contract and being reminded that the contract was not according to their agreement, J. L. Thomas said that he would change it. Both R. L. and T. A. Thomas testified in positive terms that the $200 paid J. L. Thomas was for his interest in the land in controversy and that Mrs. Virgie Thomas was never considered a party to the contract, but that her name was only signed thereto in pursuance of the custom of J. L. Thomas in transacting all his business in his wife's name; that Mrs. Virgie Thomas had no means of her own at any time.

Frank Knox, an employee in the business, testified that he had known Mrs. Virgie Thomas for ten or fifteen years and that she had no means or estate of her own; that J. L. Thomas conducted all his business in her name and deposited his money in the bank in her name.

The cashier of the bank upon which the check was drawn testified that he first drew the check for $8,000 and that then it was suggested that a certain real estate deal had been left out which would increase the check $200; that the first check was destroyed and a second one was written by him which included the $200; that the $200 was paid in settlement of some real estate deal with which the parties interested seemed familiar.

It was also shown by the manager of an oil mill with whom the parties conducted business, and had numerous transactions, that Mrs. Virgie Thomas never had any interest in the business; that he had numerous transactions

with her husband about the business and that he always claimed it to be his own; that he never heard of Mrs. Virgie Thomas being interested in any manner whatever in the business. Other facts will be referred to in the opinion.

The chancellor found the issues in favor of the plaintiff and caused a decree for specific performance to be entered of record. The defendant has appealed.

*Taylor, Jones & Taylor,* for appellant.

The question presented here is entirely one of fact. On the whole case it is clear that the chancellor erred in granting appellee specific performance of the option contract, as she was not entitled to the relief prayed. Her plea of the statute of frauds is unavailing. She had no means of her own and no money or business and paid nothing. Her husband merely used her name as a cloak as there was a judgment against him. The $200 was paid for the husband's interest in the Hunter land and not for another tract. No case was made for specific performance and her plea of the statute of frauds is not available. She was only a nominal trustee or in equity a naked trustee without any powers or rights in the land other than to hold the right to purchase for her two brothers, Alf and Lee, when Alf and his other brothers, Bob and Wallace, obtained through Atkinson's endorsement $8,200 and paid it to Lee and Lee waived and extinguished all his rights in the optional contract and Atkinson, under his arrangement with the other brothers, became no longer bound to Lee to convey the land to those of the boys who remained in business at Yorktown, namely, Bob, Alf and Wallace. 52 Ark. 207; 69 *Id.* 513. The plaintiff is estopped to plead the statute. 37 *Id.* 47; 96 U. S. 544; Bishop on Contracts, § 1237. The plea is a personal one and could only be plead by Lee Thomas. A rescission or agreement to abandon a right under a contract of option is not such a contract as is required to be in writing. Kirby's Digest, § 3654; 104 Ark. 465; 10 L. R. A. (N. S.) 867; 159 Pa. St. 142; 78 Ark. 314; 21 L. R.

A. 128; 39 W. Va. 214; 33 Fed. 530; 82 Ark. 581; 171 S. W. 1195. In any view of the case the plea of the statute of frauds is not availing. Appellee is not entitled to relief and her complaint should be dismissed. *Supra.*

*Crawford & Hooker,* for appellee.

Joel Lee Thomas being duly authorized in consideration of $200 and other valuable considerations paid, canceled and annulled the option contract set up in the complaint. The chancellor was correct in his findings. If the contention of defendant is admitted it still constituted no defense on Atkinson's part. He states that he has no interest in the outcome of this suit and he has not. Under the evidence he cannot avoid the effect of his contract to convey the land. If Mrs. Virgie Thomas had sold this option to Bob and Alf Thomas, that would be no defense to Atkinson. Mrs. Thomas has never surrendered, assigned nor sold her contract or option. The burden was on appellant to show that the interest of Mrs. Thomas belonged to her husband in the Lincoln Supply Company. J. L. Thomas could not bind his wife in any sale of the Hunter land. *Fleming* v. *Chamber of Commerce,* — Ark. *supra.*

The attempted rescission by parol is clearly within the statute of frauds. It was to cover just such cases as this. Our plea is sustained by Kirby's Digest, § 3654, par. 4; 2 Reed on Statute of Frauds 732, par. 455-6. Lee Thomas, as the chancellor held, could not be compelled to convey the Hunter land to the brothers. The great preponderance of the evidence and all the law sustains the findings of the chancellor and it should not be disturbed, as the decree is just and righteous. Cases *supra.*

HART, J., (after stating the facts). The record shows that the lands in controversy were purchased from H. L. Hunter for the sum of $4,200, of which R. G. Atkinson paid $4,000, and the remaining $200 was paid either by J. L. Thomas for himself and brother or by Mrs. Virgie Thomas. Atkinson took possession of the lands and has held them ever since. It is the contention

of the plaintiff that she signed the contract on her own account; that her husband, J. L. Thomas, had no interest in the lands; that she never authorized him to dispose of her interest therein when he sold to his brothers all his interest in the business conducted by them; and that he did not do so.

On the other hand, it is the contention of the defendant, Atkinson, that he made the contract with J. L. Thomas for the benefit of himself and brothers and that J. L. Thomas signed his wife's name thereto because he was transacting all his business in her name. In determining whether the contract in question was the independent contract of Mrs. Virgie Thomas, or whether her name was signed thereto for the benefit of her husband and in consequence, it was his contract, we must not only consider the testimony directly bearing on this phase of the case; but, also, all the testimony relating to the conduct of the parties antecedent to and following the signing of the contract which would tend to show the real character of the transaction and who was the real party in interest.

On the one hand, J. L. Thomas testified that his wife, Mrs. Virgie Thomas, executed the contract for herself and that he had no interest in it. His wife corroborated his testimony and testified that she furnished the two hundred dollars that went to pay for the land over and above the four thousand furnished by the defendant, Atkinson. She testified that she earned the $200 by the sale of butter, milk and chickens, and kept a few boarders. She made this general statement but did not enter into any particulars about how much she made, or to what extent she was conducting a separate business. She does not show that she had any bank account of her own and the testimony of her husband shows that he kept his own bank account in her name and that it was subject to his check.

On the other hand it is admitted that the defendant, Atkinson, paid $4,000 of the purchase price of the lands to Hunter and that he did this as an accommodation to

J. L. and T. A. Thomas. The intention at the time was
that they should have an option to purchase the land un-
der the terms mentioned in the contract which is the basis
of this suit and Atkinson only furnished the money as
an accommodation to them. Atkinson testified in posi-
tive terms that he made the contract with J. L. Thomas
and that his wife's name was signed thereto because J.
L. Thomas carried on all his business in her name; that
Thomas so explained the transaction to him at the time.
T. A. Thomas was the one who first thought of purchas-
ing the lands and said that they were to be purchased for
the benefit of their business, which was that of furnish-
ing supplies to plantations. He said that it was thor-
oughly understood that the lands were to be purchased
for his brother J. L. Thomas and himself and that J. L.
Thomas so admitted to him after the contract had been
made and explained that it was made in his wife's name
because he transacted all his business in her name. He
further testified that the $200 was taken out of their busi-
ness and applied toward the purchase price of the lands.

The undisputed evidence shows that J. L. Thomas
transacted all his business in his wife's name. J. L.
Thomas himself admitted this to be true. It is not
claimed that Mrs. Virgie Thomas ever entered into any
other business transaction of her own. All the witnesses
say they have known her for quite a number of years
and that she had no independent estate or business of her
own. She herself does not claim any except what she
might have made off of her cows and chickens and does
not even pretend to state how much this was. So it may
be said that the undisputed evidence shows that J. L.
Thomas had conducted all his business in his wife's name
for a period of several years before the execution of the
contract in question and that during all this time his wife
never engaged in any business transaction whatever, nor
did she ever interest herself in her husband's business
affairs. These circumstances shed light upon the transac-
tion in question and tend to show its true character.

In addition, the record shows that Atkinson furnished the money for the purchase of the land in question as an accommodation to J. L. and T. A. Thomas. He did not expect at the time that there would be any considerable rise in the value of land and expected them to pay him his money back and take a conveyance of the land to themselves. He knew that they had means with which to purchase the land and that Mrs. Thomas did not have any means whatever. These facts in addition to those already related tend strongly to show that the contract was made with J. L. Thomas and that the use of the name of Mrs. Virgie Thomas in signing the contract was merely a cloak, or at least, was the use by J. L. Thomas of the trade name by which for years he had carried on his business, and it is immaterial whether he or she actually affixed her signature to the contract.

When all the facts and circumstances preceding and following the execution of the contract are read in the light of the evidence relating to the execution of the contract, we are of the opinion that the clear preponderance of the evidence shows that the contract was made by J. L. Thomas and not by Mrs. Virgie Thomas.

It is next contended that a clear preponderance of the evidence shows that the option contract was annulled or rescinded by the act of the parties and that the $200 was restored to J. L. Thomas. We agree with counsel in this contention. It is true Mrs. Virgie Thomas testified that she did not give J. L. Thomas any authority to rescind the contract; but if we are correct in holding that she was not a party in interest to the contract, it would not be necessary for him to have permission from her. J. L. Thomas admits getting $200 over and above the $8,000 which was to be paid for his share in the business and that the $200 was paid him on account of a real estate transaction; but he says that it was on account of another real estate transaction which he describes. The record shows, however, that this tract of land had been sold prior to the time he sold out his interest in the business and that the proceeds had gone into the business. The

cashier of the bank who drew the check in favor of J. L. Thomas for the $8,000 states that the $200 was paid him for his interest in a land contract. T. A. Thomas and Atkinson both testified that the contract was the one involved in controversy in this case. This land was situated near to the store and would be considered a considerable asset in the business. Atkinson was furnishing the money with which to buy out the interest of J. L. Thomas. He knew that Mrs. Thomas did not have any independent means of her own and that the object of buying the lands in controversy was to use them in connection with the business. The parties did not at that time anticipate any considerable rise in the price of real estate. It is conceded that Mrs. Thomas would have had to borrow the money with which to pay for it when she exercised an option to purchase it.

When all these facts and circumstances are read and considered in the light of each other, we are of the opinion that a clear preponderance of the evidence shows that the $200 was paid J. L. Thomas for the purpose of annulling and rescinding the contract which is the basis of this suit.

Again it is sought to uphold the decree upon the plea of the statute of frauds. It is claimed that the admission of oral evidence to show a rescission of the contract would be in contravention of the statute of frauds. J. L. Thomas did not go into possession of the lands. He was paid back the $200 which he had paid out under the contract and as we have already seen, a preponderance of the evidence shows that this was for the purpose of rescinding the contract. It is firmly established that a parol discharge of a written contract within the statute of frauds is available in equity to repel a claim upon that contract. Brown on Statute of Frauds, (5 ed.), sec. 433; Wood on Statute of Frauds, sec. 403; *Phelps* v. *Seely*, 22 Grat. (Va.) 573; *Marsh* v. *Bellew*, 45 Wis. 36; *Jones* v. *Booth*, 38 Ohio St. 405; *Miller* v. *Pierce*, 104 N. C. 389, and *Arrington* v. *Porter*, 47 Ala. 714. It follows that the decree must be reversed and the cause

will be remanded with directions to the chancellor to dismiss the complaint for want of equity.